IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 20-cv-00756-PAB

EDWARD NELLSON, individually, and on behalf of others similarly situated,

    Plaintiff,

v.

WARDEN J. BARNHART, in his individual and official capacity, and
UNITED STATES FEDERAL BUREAU OF PRISONS,

    Defendants.

_____

**ORDER**
_____

This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 10]. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND**

Edward Nellson is an inmate at the United States Penitentiary in Florence, Colorado ("USP Florence"). Docket No. 10 at 1. He purports to represent a class of similarly situated inmates. Docket No. 1 at 1, 18. Plaintiff alleges that USP Florence is (1) not screening inmates or staff members for COVID-19, (2) not testing prisoners for COVID-19, (3) not isolating prisoners who test positive for COVID-19, and (4) not preventing infected staff members from working. Docket No. 10 at 1. Mr. Nellson filed a complaint on March 18, 2020, alleging that the failure to take the above steps violates his rights, and those of the class, under the Eighth Amendment. *See* Docket No. 1. On

March 31, 2020, Mr. Nellson filed a motion for temporary restraining order ("TRO"), requesting that the Court order USP Florence to begin instituting screening, testing, and isolation of both inmates and staff.  Docket No. 10 at 1-2.

Defendants filed a response on April 6, 2020, wherein they outline the steps that the Bureau of Prisons ("BOP") and USP Florence have taken to reduce the risk to inmates from COVID-19.  *See* Docket No. 17.[1]  Defendants indicate that the BOP has adopted a multiphase "Action Plan."  Docket No. 17-1 at 4, ¶¶ 6-7.  On a nationwide basis, the BOP has

> implemented screening requirements for inmates and staff; temporarily suspended social visits, legal visits, inmate transfers, official travel, and contractor access; updated its quarantine and isolation procedures; and instituted a 'modified operations' plan, which directs BOP facilities to adjust their daily operations in a manner that permits inmates to engage in physical distancing while in common areas, such as during mealtimes and recreation.

Docket No. 17 at 2-3 (citing Docket No. 17-1 at 5-7, ¶¶ 8-15).  Additionally, on April 1, 2020, the BOP required "all inmates to remain 'secured in their assigned cells' for a period of 14 days . . . to decrease the spread of the virus."  *Id.* at 3 (citing Docket No. 17-1 at 7-8, ¶ 16).  As a result, "BOP inmates across the country are currently being confined to their cells for the majority of each day."  *Id.* (citing Docket No. 17-1 at 8-9, ¶ 17).

At USP Florence, the following measures have been taken regarding inmates:

---

[1] The response attaches as Exhibit 1 the declaration of Shari Himlie, the Health Services Administrator for USP Florence and the three other federal prisons located in Florence Colorado.  *See* Docket No. 17-1.  Ms. Himlie oversees the health services operations at each of the Florence prisons.  *Id.* at 2-3, ¶ 1-4.

(1) new inmates are screened and quarantined for 14 days regardless of whether the inmate displays symptoms; (2) high-risk individuals, as defined by the Centers for Disease Control and Prevention ("CDC"), are screened, given temperature checks, and provided "additional education regarding COVID-19 prevention"; (3) medical staff check on general population housing units twice a day; (4) inmates with work details are screened for symptoms and have their temperatures taken before shifts begin and then again before returning to their housing units; (5) any inmate presenting COVID-19 symptoms is immediately evaluated to determine whether testing or isolation is appropriate and whether any other inmate who had contact with the symptomatic inmate should be quarantined; (6) designated quarantine and isolation units have been created; and (7) inmate testing is based on CDC guidance, looking to the nature and severity of symptoms, an inmate's potential exposure to COVID-19 and risk profile, and whether an inmate has a work detail that requires contact with other inmates or staff. Docket No. 17-1 at 13-16, 18, ¶¶ 33-50, 58.

Regarding staff and visitors, USP Florence has implemented the following measures: (1) all staff and visitors must have their temperature taken, disclose symptoms of illness, and answer questions designed to evaluate their risk of exposure before entering USP Florence; (2) any staff member or visitor who reports symptoms or has a temperature of above 100.4 degrees Fahrenheit may be excluded from the building; and (3) any staff member who has been tested for COVID-19 is not permitted to return to work until she receives a negative test result. *Id.* at 16-17, ¶¶ 52-53, 55.

USP Florence has taken additional, staff-related steps by: (1) limiting the

number of in-person meetings; (2) capping the number of attendees at in-person meetings; (3) replacing in-person meetings with video-conferencing to the extent practicable; and (4) requiring staff members to work at only one institution in the complex where USP Florence is located. *Id.* at 19-20, ¶¶ 65, 69

As to sanitation, USP Florence: (1) provides all inmates with access to sinks, water, and soap at all times; (2) offers new soap weekly; (3) gives all new inmates soap upon arrival; (4) provides soap at no cost to any inmate without sufficient funds to purchase it; (5) cleans housing common areas at least once daily, "typically" multiple times a day, with a disinfectant that kills coronavirus; (6) provides inmates with the disinfectant so that they may clean their cells with it; (7) cleans common areas outside the living areas with the disinfectant on a daily basis and "often multiple times a day"; (8) disinfects staff common equipment, such as radios and keys, whenever an item is checked out or returned; (9) provides personal protective equipment, such as respirator masks, surgical masks, and rubber gloves, to staff in quarantined areas, isolation units, and screening sites; and (10) provides all inmates and staff protective masks for daily use. *Id.*, ¶¶ 62-64, 67-68

As of the date of this order, the BOP website shows no reported COVID-19 cases among prisoners or staff as USP Florence. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last updated Apr. 15, 2020).

## II. LEGAL STANDARD

The standard for a TRO is the same as that for a preliminary injunction. *See Wiechmann v. Ritter*, 44 F. App'x 346, 347 (10th Cir. 2002). To succeed on a motion

for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 US. 7, 20 (2008)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quotations and citation omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of preliminary injunctions that are disfavored: (1) injunctions that disturb the status quo, (2) injunctions that are mandatory rather than prohibitory, and (3) injunctions that provide the movant substantially all the relief it could feasibly attain after a full trial on the merits. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005). In seeking a disfavored injunction, "the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations and alterations omitted); *see also Schrier*, 427 F.3d at 1259 (stating that such injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal

course" (quotations omitted)).

Plaintiff here seeks an injunction that alters the status quo. Therefore, plaintiff's motion falls under the heightened standard for preliminary injunctions. *See Schrier*, 427 F.3d at 1260.

## III. ANALYSIS

Before reaching the merits of plaintiff's motion, the Court addresses defendants' argument that plaintiff is required to exhaust administrative remedies before seeking a TRO. The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language is mandatory. *See Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA."). "[T]he PLRA's text suggests no limits on an inmate's obligation to exhaust," except that administrative remedies must be "available." *Ross*, 136 S. Ct. at 1856. As a result, "a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Id.* at 1856-57. Availability, however, does not turn on the types of remedies available through the administrative procedures, but on the administrative procedures themselves. *Booth v. Churner*, 121 S. Ct. 1318, 1825 (2001). There must be "the possibility of some relief," not all relief an inmate hopes to receive through the grievance process. *Ross*, 136 S. Ct. at 1859 (quotations omitted).

A plaintiff is required to exhaust administrative remedies before seeking a TRO

or a preliminary injunction, just as he is required to do before seeking other remedies covered by the PLRA. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994) ("When a prison inmate seeks injunctive relief, a court not need ignore the inmate's failure to take advantage of adequate prison procedures, and an inmate who needlessly bypasses such procedures may properly be compelled to pursue them."); *Little*, 607 F.3d at 1249 (addressing exhaustion before reaching the merits of a plaintiff's request for a preliminary injunction due to prison conditions).

The Supreme Court has described the PLRA as a "mandatory exhaustion" statute and has "reject[ed] every attempt to deviate . . . from its textual mandate." *Ross*, 136 S. Ct. at 1857. "Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure." *Little*, 607 F.3d at 1249. The only "textual exception to mandatory exhaustion" in the PLRA is the "availability" of administrative remedies. *Ross*, 136 S. Ct. at 1858. The Supreme Court has noted three types of administrative remedies that, "although officially on the books, [are] not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when . . . it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, a remedy can become unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Here, Mr. Nellson has not alleged that he has attempted to "follow[] . . . the steps laid out in the prison system's grievance procedure[s]." *Little*, 607 F.3d at 1249. Plaintiff does, however, argue that the administrative grievance process is unavailable to him because it is a "dead end" that would take ninety days to complete, which would put plaintiff and other inmates at USP Florence at risk of COVID-19. Docket No. 19 at 7-8. However, the dead-end exception to exhaustion is only relevant when "officers [are] unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. Plaintiff does not argue that defendants are unwilling or unable to implement the type of relief that he requests. The steps outlined by defendants belie plaintiff's argument that defendants are unable or unwilling to provide relief in response to COVID-19.

Plaintiff's dead-end argument is another formulation of his argument that, because plaintiff is at risk, he is not required to exhaust his administrative remedies since the grievance process can "offer no possible relief in time to prevent the imminent danger." Docket No. 19 at 4 (citing *Fletcher v. Menard Correctional Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010)). Plaintiff relies on *Fletcher*, a case from the Seventh Circuit, to support his argument. *See* 623 F.3d at 1173. *Fletcher*, however, does not support the unavailability of administrative remedies in plaintiff's situation.

First, *Fletcher* was decided before *Ross*. Second, and more importantly, *Fletcher* did not hold that any inmate in imminent danger is always exempted from exhausting administrative remedies. *Fletcher* held that, where there are no administrative remedies that can redress an immediate danger to inmate health or

8

safety, administrative remedies are unavailable. 623 F.3d at 1173. But, in *Fletcher*, the Seventh Circuit found that the plaintiff had emergency grievance procedures available to him, which the plaintiff did not exhaust. *Id.* at 1175. As a result, the Seventh Circuit held that the plaintiff had not exhausted his administrative remedies. *Id.* ("[T]he imminent-danger exception does not excuse a prisoner from exhausting remedies tailored to imminent dangers. Fletcher had an available such remedy.").

Here, 28 C.F.R. § 542.18 offers inmates an emergency procedure where, "[i]f the Request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing." 28 C.F.R. § 542.18; *see also Ray v. Aztec Serv. Co.*, 784 F.2d 888, 889 (10th Cir. 1984) ("This court can take judicial notice of agency rules and regulations."). Plaintiff is thus incorrect that "[t]here is no guarantee that any individual responding to Mr. Nellson's requests will, in fact, do so in the time promised." Docket No. 22-1 at 2. Notification of this regulation is provided to prisoners through the BOP's Program Statement for the Administrative Remedy Program. *See* Docket No. 21 at 7 (citing Fed. Bureau of Prisons, Administrative Remedy program (2014), https://www.bop.gov/policy/progstat/1330_018.pdf). Thus, under *Fletcher*, plaintiff had an administrative remedy available to him that takes into account the speed and nature of the COVID-19 emergency. Plaintiff makes no allegation that he attempted to utilize this emergency procedure or that it was a dead end. *See Brown v. Eardley*, 184 F. App'x 689, 692 (10th Cir. 2006) (unpublished) (holding that, if the emergency grievance procedure applies, a plaintiff is "required to exhaust fully those grievances").

Additionally, the Supreme Court defines availability as some relief, not all relief, that an inmate seeks. *See Ross*, 136 S. Ct. at 1859. Plaintiff does not argue that he would be able to receive no relief whatsoever through the administrative grievance process but, rather, that the process would not be able to institute all the relief he requests immediately. But total and immediate relief is not the standard for exhaustion, "the possibility of some relief" is. *Id.* (quotations omitted). Moreover, as defendants point out, plaintiff is not required to complete the entire administrative process before receiving some relief; he may get relief at any stage of the administrative process. *See* Docket No. 21 at 1-2.

The Court finds that plaintiff has failed to exhaust his administrative remedies before seeking judicial relief. In reaching this conclusion, the Court does not overlook the risks of COVID-19 at USP Florence or in the prison system generally. But the Court may not alter the mandatory requirements of the PLRA for COVID-19 or any other special circumstance. *See Ross*, 136 S. Ct. at 1856-57 ("[A] court may not excuse a failure to exhaust, even to take [special] circumstances into account.").

Even assuming that plaintiff exhausted his administrative remedies, he still would not be entitled to a TRO because defendants have already implemented the relief that he requests. As a result, plaintiff cannot show "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiff requests the following relief: (1) screening of prisoners and staff for symptoms of COVID-19; (2) testing of prisoners and staff demonstrating symptoms of COVID-19; (3) quarantining of inmates testing positive for COVID-19; and (4) preventing staff testing positive for COVID-19

from contact with inmates.  Docket No. 10 at 1-2.  The BOP states that it has implemented all four of plaintiff's requests.

First, as to screening, all new inmates and high-risk inmates USP Florence are screened for symptoms of COVID-19.  Docket No. 17-1 at 13-14, ¶¶ 33-35, 41.  Medical staff checks on general population inmates twice daily to ensure that general population inmates are not exhibiting symptoms.  *Id.* at 15, ¶ 46.  Additionally, inmates with a work detail are screened and have their temperatures taken each time they begin and end their work detail.  *Id.*, ¶ 45.  Staff are also screened for symptoms and are required to have their temperatures taken.  *Id.* at 16-17, ¶ 52.

Second, as to testing, USP Florence tests inmates in accordance with CDC protocols.  *Id.* at 17-18, ¶¶ 56-58.  This includes analyzing an inmate's exposure risk profile and determining whether an inmate has had potential exposure to COVID-19 or is exhibiting symptoms.  *Id.* at 18, ¶ 58.

Third, as to quarantine, the BOP has instituted a stay in place order, requiring all prisoners to limit movement as much as practicable.  *Id.* at 7-8, ¶ 16.  USP Florence has set up special units for isolation and quarantine.  *Id.* at 16, ¶¶ 48-51.  USP Florence also considers quarantining individuals who have had contact with those exhibiting symptoms of COVID-19, even if those individuals do not exhibit symptoms themselves.  *Id.*

Fourth, as to exclusion of staff, any staff members exhibiting symptoms or measuring a fever of 100.4 degrees Fahrenheit or above may be excluded, regardless of whether they have tested positive for COVID-19.  *Id.* at 16-17, ¶¶ 52-54.  Any staff

member who has been tested is not allowed to return to work until that staff member tests negative. *Id.* at 17, ¶ 55.

Because defendants have instituted all the relief that plaintiff requests, the Court finds that plaintiff will not suffer likely irreparable harm if the Court denies plaintiff's request for a TRO. *Winter*, 555 U.S. at 22. The lack of an injunction cannot harm plaintiff when the injunctive relief would add no additional measures beyond defendants' current screening, testing, and isolation procedures. Because granting a preliminary injunction requires a showing on each factor and plaintiff cannot show irreparable harm, he cannot succeed on his TRO motion. *See Winter*, 555 U.S. at 23-24 (holding that "[a] proper consideration" of the balance of equities and public interest "alone requires denial of the requested injunctive relief" and, therefore, declining to address the likelihood of success on the merits); *see also Big O Tires, LLC v. Felix Bros., Inc.* 724 F. Supp. 2d 1107, 1121 (D. Colo. 2010) (declining to address every factor because "the resolution of them will have no bearing on the outcome").

In reply, plaintiff argues that not all of the defendants' measures are being implemented. Specifically, plaintiff argues that only cloth masks, and not N95 medical masks, are being offered to inmates. Docket No. 19 at 8. Additionally, plaintiff argues that it is impossible to maintain physical distancing in the "restrooms or the law library" and that inmates are not being provided with soap. *Id.* at 8-9. Defendants indicate, however, that when inmates are allowed out of their cells, they have been directed to maintain appropriate physical distancing. Docket No. 17-1 at 8-9, ¶ 17. Plaintiff does not explain why he must use the communal restrooms, as opposed to a toilet in his cell,

and why he must use the law library at times when physical distancing is not possible. However, if plaintiff's allegations are true, they would not be enough to show deliberate indifference and, as a result, plaintiff does not have a likelihood of success on the merits.

A claim for deliberate indifference to serious medical needs has an objective and a subjective component. The objective component requires that the medical need be "sufficiently serious." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The subjective component requires that "a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.* (citation and quotations omitted).

Assuming that the objective component is met, and that prison officials know of the risk of COVID-19, plaintiff has not demonstrated that defendants have disregarded that risk. As outlined above, defendants have taken numerous steps to reduce the risk of transmission at USP Florence. A lack of social distancing in the law library and communal restrooms, as well as the provision of cloth, rather than N95 masks, does not demonstrate that defendants have disregarded the risk of COVID-19 at USP Florence. The CDC has stated that cloth masks are sufficient for non-medical workers and suggests that only medical professionals use N95 masks because they are in short supply. *See Cloth Face Coverings: Questions and Answers*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-faq.html (last updated Apr. 4, 2020) ("Surgical masks and N95 respirators are in short supply and should be reserved for healthcare workers or other medical first responders, as recommended by CDC guidance."). Providing CDC-

recommended face masks does not demonstrate that defendants are disregarding a risk to inmate health or safety.

As to plaintiff's contention that inmates have not been provided soap, Ms. Himlie's declaration states that USP Florence is providing prisoners with soap weekly and at no cost if an inmate cannot afford it.  Docket No. 17-1 at 19, ¶ 62.  Additionally, plaintiff purchased soap as recently as April 14, 2020.  Docket No. 21-1 at 3, ¶ 6.  Given these considerations, and the steps that defendants have taken, the Court finds that defendants have not disregarded a substantial risk to inmate safety and, therefore, plaintiff is not likely to succeed on the merits.

## IV. CONCLUSION

For the foregoing reasons it is

**ORDERED** that Plaintiff's Motion for Leave to File Surreply [Docket No. 22] is **GRANTED**.  Accordingly the Clerk's office shall docket Exhibit 1 to Docket No. 22 as plaintiff's surreply.  It is further

**ORDERED** that the portion of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 10] that requests a temporary restraining order is **DENIED**.

DATED April 16, 2020.

BY THE COURT:

_____
PHILIP A. BRIMMER
Chief United States District Judge