# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **EDWARD NELLSON**, individually, and a **CLASS** of similarly-situated persons, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 1:20-cv-00756-PAB-NYW |
| **WARDEN J. BARNHART, in his official capacity** | ) ) ) | |
| **And** | ) ) | |
| **FEDERAL   BUREAU OF PRISONS,** | ) ) | **JURY DEMANDED** |
| Defendants. | ) | |

## <u>FIRST AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF REGARDING EDWARD NELLSON AS AN INDIVIDUAL AND ALL SIMILARLY SITUATED PERSONS AS A CLASS</u>

Plaintiff, Edward Nellson, files this Complaint on behalf of himself, and as a representative of all similarly situated members of a class, against the Federal Bureau of Prisons ("BOP"), and Warden Barnhart in his individual and official capacity, using 28 U.S.C. §§ 1343(a)(4), 2201, 2202, and Fed. R. Civ. P. 65, to vindicate their rights to be free from cruel and unusual punishment under the Eighth Amendment and other applicable Constitutional provisions.

## **INTRODUCTION**

The people of this country face a critical threat from the novel coronavirus COVID-19. This virus has been declared a pandemic by the World Health Organization. https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (last accessed March 15, 2020). This virus is spread person to person, with the CDC recommending the disbandment of all mass gatherings, social distancing is key to avoiding the spread of this illness. https://health.clevelandclinic.org/covid-19-understanding-quarantine-isolation-and-social-distancing-in-a-pandemic/ (last accessed March 15, 2020). Unfortunately, for people in prison, social distancing is not possible. Further, medical care and testing is entirely in the hands of Defendant Federal Bureau of Prisons, which literally holds prisoners' lives in their hands.

Testing and isolation are the key to preventing the spread of COVID-19 in prison. However, despite this fact and despite the fact that prisons are a *known* hotbed for infections and viral pandemics, Defendants have yet to implement a systemic testing protocol for prisoners and staff. This is outrageous and a dereliction of duty towards some of the most vulnerable people in our society. By failing to test prisoners and staff, Defendants are **knowingly** risking the lives of every prisoner in the BOP, including USP Florence.

## JURISDICTION AND VENUE

1.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(4). This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202. This Court may also grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

2.

Venue is proper under 28 U.S.C. § 1391(b) and L.R. 3.1(B)(3) because (1) a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District and Division; (2) Defendants reside and transact business in this District and Division; and (3) Defendants transact business throughout the country, therefore any judicial district where Defendant is subject to personal jurisdiction with respect to this action is appropriate.

## PARTIES

3.

At all times relevant to this Complaint, **Plaintiff Edward Nellson** was a citizen of the United States and is currently incarcerated in Colorado. Nellson is currently a prisoner in the BOP. At all times relevant to this Complaint, Nellson had clearly established legal rights under state and federal law and the United States Constitution. Nellson submits

himself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, and any other permissible damages as well as for Declaratory and Injunctive relief.

4.

**Defendant Federal Bureau of Prisons** ("BOP") is a federal agency organized and existing under federal laws and has been so for a period preceding six months prior to the filing of this case. Also, at the time of the subject event that has given rise to this lawsuit, BOP was responsible for the care and protection of all individuals remanded by the Courts into the custody of the BOP. BOP has developed, promoted, and instituted a practice and policy of responding to the spread of the deadly coronavirus pandemic without testing and isolating individual prisoners for the virus.

5.

**Defendant Warden J. Barnhart** is the Warden at USP Florence. Defendant Barnhart is responsible for the implementation or non-implementation of any practice and procedure with respect to screening, testing, and addressing COVID-19 in USP Florence, CO. Defendant Barnhart has ultimate authority within USP Florence.

6.

*The Defendants have adopted and continue to implement and enforce—by affirmative act or omission—a policy that leaves Plaintiff and all similarly situated individuals exposed to infection from an incredibly deadly virus running pandemic through*

*this country.* Nellson is using the U.S. Constitution, federal statutes, 28 U.S.C. §§ 1343(a)(4), 2201, 2202, and Fed. R. Civ. P. 65, and other applicable federal laws, as the vehicle to sue the BOP regarding his federal claims.

7.

Defendants' practice and policy ensures that the prisoners within BOP, including USP Florence, are continually exposed to a multitude of other prisoners, in close proximity, without adequate testing to ensure that prisoners with the virus are removed from that population.

## STATEMENT OF FACTS

### A.  COVID-19 is identified in Wuhan, China, and begins its spread

8.

China reported an outbreak of a flu-like illness in the city of Wuhan, in the Hubei province, to the World Health Organization on December 31, 2019. https://www.pharmaceutical-technology.com/news/coronavirus-a-timeline-of-how-the-deadly-outbreak-evolved/ (last accessed on March 15, 2020). This new coronavirus is labelled COVID-19. Id.

9.

Within 11 days the first death was reported in China. Id. The disease was confirmed to have spread to Thailand two days later, on January 13, 2020, and Japan two days after

that, on January 15, 2020. <u>Id.</u> South Korea and the United States report their first cases of the virus within the next week. <u>Id.</u>

10.

In response to this international spread, the World Health Organization ("WHO") declared a health emergency on January 22, 2020. <u>Id.</u>

11.

Over the next week Singapore, Nepal, France, Mexico, Sri Lanka, Germany, the United Arab Emirates, Australia, and Taiwan all report cases of the COVID-19 virus. <u>Id.</u> Additionally, by January 29, 2020, the first cases of community spread of COVID-19, that is spread within a country to individuals who had not visited Wuhan, China, or come into contact with someone who had, were reported in Japan, Taiwan, and Germany. <u>Id.</u>

12.

On January 30, 2020, the United States reported its first case of domestic spread of the Coronavirus. <u>Id.</u> The next day, with the death toll confirmed at 213, the WHO declared COVID-19 a global health emergency. <u>Id.</u>

13.

By February 12, 2020, the death toll from COVID-19 has passed 1,100 and the Mobile World Congress was cancelled over fears of the virus. <u>Id.</u> By the next day, the death toll had risen by 254, to 1,369. <u>Id.</u>

14.

On February 27,2020, with the death toll from COVID-19 topping 2,800 and having spread to a dozen other countries, the United States detected the first suspected community spread case within the U.S.

15.

On March 11, 2020, the WHO declared COVID-19 a pandemic. Id. At this time, the death toll has passed 5,800. Id. COVID-19 has spread to 126 countries and Vatican City. https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/ world-map.html (last accessed March 15, 2020).

**B. COVID-19 spreads throughout the United States**

16.

Having confirmed the first case of COVID-19 in the United States on January 21, 2020, the virus has spread to 46 states and the District of Columbia, according to the Centers for Disease Control ("CDC"). https://www.cdc.gov/ coronavirus/2019-ncov/cases-in-us.html (last accessed on March 15, 2020). An employee of the New York Department of Corrections and an employee of the Washington Department of Corrections have tested positive for COVID-19 on March 15, 2020, and March 12, 2020, respectively.

17.

As of March 13, 2020, the U.S. had reported 1,629 cases of COVID-19 and 41 deaths. Id. Those numbers are rapidly increasing. By March 15, 2020, according to other sources, COVID had reached over 3,000 cases and 57 deaths.

https://www.livescience.com/coronavirus-updates-united-states.html (last accessed March 15, 2020).

18.

Nursing homes nationwide, where people live in close quarters daily, have limited visitors and begun testing of residents and workers. https://www.washingtonpost.com/nation/2020/03/12/coronavirus-seattle-nursing-homes/ (last accessed March 15, 2020).

19.

The President declared the COVID-19 spread within the United States a national emergency on March 13, 2020. https://www.whitehouse.gov/ presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed March 15, 2020). This proclamation noted that COVID-19 threatens to strain the U.S. hospital and medical resources. Id.

## C.  How COVID-19 is spread, its effects and its deadliness

20.

COVID-19 is mainly spread person to person, both by being in close contact and from respiratory droplets spread through coughing and sneezing. https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed on March 15, 2020).

21.

COVID-19 is, however, transmissible by contact with contaminated surfaces as well as by persons who do not show symptoms. Id.

22.

While COVID-19 spread is slower than that of influenza, its reproductive number, that is the number of people infected per infected person, is between 2 and 2.5, higher than that of the flu. https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_2 (last accessed on March 15, 2020).

23.

One major difference between COVID-19 and influenza is that, while there are some people who can spread the virus 24-48 hours prior to symptom onset, pre-symptom spread is not a primary driver of transmission for COVID-19. Id.

24.

The main symptoms of COVID-19 are fever, cough, and shortness of breath. Id. It can, however, lead to pneumonia, cytokine storm, and multi organ failure leading to death. https://www.aljazeera.com/news/2020/02/infected-coronavirus-200210205212755.html (last accessed March 15, 2020).

25.

15% of those infected with COVID-19 develop a severe infection, requiring hospitalization and oxygen treatment. https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_2 (last accessed on March 15, 2020).

26.

5% of individuals infected with COVID-19 develop critical infections, requiring ventilation in a hospital. Id.

27.

3-4% of COVID-19 patients dies as a result of the infection, which at this time is a rate well in excess of the flu, which has a mortality rate well below 0.1%. Id.

**D. Testing is critical for containment of COVID-19**

28.

With the heightened infectivity of COVID-19, social distancing, that is keeping a distance from infected individuals, and medical isolation are critical to prevent the spread of the virus. https://www.cdc.gov/coronavirus/2019-ncov/ cases-updates/summary.html (last accessed March 15, 2020).

29.

Social distancing is not available for prisoners in BOP prisons, including USP Florence. BOP prisons currently house 175,483 per the BOP. https://www.bop.gov/mobile/about/ population_statistics.jsp (last accessed March 15,

2020). This leaves prisoners like Nellson packed into close quarters, housed with other prisoners, with multiple cells in a single pod, sharing meals multiple times per day.

30.

BOP prisoners, including those as USP Florence, including Plaintiff Nellson, and putative class members, take meals in a communal chow hall, utilize communal showers, have cells with open toilets in them, and have communal recreation areas.

31.

Without the ability to isolate and engage in social distancing, isolation of prisoners who have COVID-19 from this population prior to passing the infection is critical to controlling the spread of this illness.

32.

Isolating all prisoners with the symptoms of COVID-19, fever, cough, or shortness of breath, and testing for the virus is the only effective means to prevent the spread of COVID-19 in this captive population.

**E. COVID-19 arrives in Colorado.**

33.

On March 10, 2020, Colorado had 33 cases of COVID. https://www.nbc11news.com/content/news/15-total-cases-of-COVID-19-in-Colorado-one-confirmed-case-in-Gunnison-County--568667371.html (last accessed March 15, 2020).

34.

On March 14, 2020, Colorado Gov. Jared Polis issued the extraordinary executive order requiring all Colorado ski resorts to close.

35.

As of March 15, 2020, there were 131 presumptive positive cases of COVID in Colorado and one confirmed death. https://www.kktv.com/content/news/ BREAKING--568535251.html.

36.

As of March 15, 2020, Colorado had identified COVID-19 cases in seventeen counties, including Denver County and Arapahoe County, both highly populated counties. Colorado has also identified one COVID-19 case in Pueblo County, a county near USP Florence and other BOP prisons.

37.

On March 16, 2020, the Colorado Governor's Office ordered the closure of all bars, restaurants, theaters, and casinos statewide, for anything other than takeout or delivery. https://drive.google.com/file/d/1pXAFPXCTLqBZvTJpuqrH45YeLB_Jc2wP/view   (last accessed March 17, 2020). Even when people come to take out food, they are only allowed to be on premises five at a time. Id.

38.

As stated above, USP Florence prisoners eat <u>together</u> and continue to serve each other food, with no testing or monitoring for symptoms. Further, USP Florence prisoners cannot be "five at a time" in their various living arrangements. Unable to take the precautionary measures, USP Florence prisoners are sitting ducks in this pandemic, at the mercy of Defendants' inaction.

39.

Upon information and belief, the number of COVID-19 infections is expected to grow exponentially over the next days and weeks, if not months.

**F. The CDC and subject-matter experts recognize the risk of the spread of disease, like influenza, within its institutions.**

40.

Even with the flu, the CDC had recommended "Rapid Detection of Cases" to be done via testing of people with influenza-like illnesses to determine what viruses were circulating at the institution. https://www.cdc.gov/h1n1flu/guidance/correctional_facilities.htm (last accessed March 15, 2020).

41.

Prisoner populations are sicker than the general population. A 2018 study in The Lancet that incarcerated individuals have a higher burden of infectious illnesses such as HIV, hepatitis B and C, syphilis and tuberculosis than non-incarcerated individuals. https://www.thelancet.com/journals/lancet/article/ PIIS0140-6736(18)31251-0/fulltext (last accessed March 15, 2020).

42.

Further, incarcerated populations have chronic, noninfectious diseases such as COPD, heart failure and kidney disease which also increase the risk for infections such as coronavirus. Id.

43.

There are also clear indications that mortality is higher among the senior population. See e.g. https://www.thelancet.com/journals/lancet/article/ PIIS0140-6736(20)30566-3/fulltext#seccestitle150 (last accessed March 15, 2020).

44.

6% of the BOP population is aged 60 and above while 19.5% of the BOP prisoner population is aged 51 and above. https://www.bop.gov/about/statistics/ statistics_prisoner_age.jsp (last accessed March 15, 2020).

**G. The BOP's COVID-19 Response is inadequate**

45.

The BOP, including USP Florence, has made a minimal response to the COVID-19 pandemic. The BOP has suspended social visits, prisoner movement, and legal visits. https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed March 15, 2020.

46.

Upon information and belief, neither BOP nor USP Florence have ordered COVID-19 testing kits. https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690 (last accessed March 15, 2020).

47.

To date, the BOP has not tested all prisoners within USP Florence for COVID-19. Ex. 1, Nellson Dec. at ¶ 7.

48.

The BOP is currently screening staff members upon entry to USP Florence for any symptoms or exposure to COVID-19 but is not testing them.

49.

Despite requests from prisoners, the BOP has not provided counseling to at-risk prisoners about COVID-19. Ex. 1, Nellson Dec. at ¶ 25; Ex. 4 Adams Dec. at ¶ 12 ("I'll be 65 years old in a month and a half. They've never talked to me about COVID. Ain't nobody says nothing. If someone brings it up, staff just walk away. Don't nobody care.").

50.

USP Florence prisoners assigned to kitchen and other sanitary-related duties are continuing to perform those duties. They are doing this with **no screening** and **no testing** to ensure they are not carriers. "The guards also don't screen the prisoners daily. No inmate gets their temperature taken, period. We never have our temperature taken, including the guys who leave the unit for work-duty to work in the kitchen or laundry or commissary."

Ex. 1, Nellson Dec. at ¶¶ 14-15. See also Ex. 4, Adams Dec. at ¶ 12 ("Guys who work in the commissary, the kitchen, and the laundry are the only ones going to work right now. They aren't screened or tested at all though.").

51.

Though the BOP states it is screening prisoners before they begin their shifts in the kitchen, commissary, laundry, or other essential job, these prisoners often are not screened at all. Ex. 1, Nellson Dec. at ¶ 14; Ex. 4, Adams Dec. at ¶ 12.

52.

Mr. Candelaria works as a chemical clerk, moving cleaning chemicals between storage and his unit. Ex. 2, Candelaria Dec. at ¶ 6.

53.

When he takes his cart to the office, Mr. Candelaria can only go at the same time they call him and other chemical carts from different units. Ex. 2, Candelaria Dec. at ¶ 6.

54.

When the carts are returned, Mr. Candelaria is in close contact with about thirty people from other units before returning to his own unit. Ex. 2, Candelaria Dec. at ¶ 6.

55.

Mr. Candelaria has never been screened or tested, despite interacting with prisoners from other units. Ex. 2, Candelaria Dec. at ¶ 6.

56.

Mr. Lymon worked in the laundry and was a laundry cart pusher. Ex. 3, Lymon Dec. at ¶ 14.

57.

Mr. Lymon has never had his temperature taken as a precaution to COVID-19. Ex. 3, Lymon Dec. at ¶ 14.

58.

Louis Holmes works in the kitchen at USP Florence on the afternoon, or "PM," shift. Ex. 5, Holmes Dec. ¶ 16.

59.

Though the prisoners working in the kitchen were having their temperatures checked at the beginning of the COVID-19 pandemic, that practice was short-lived. Ex. 5, Holmes Dec. ¶ 18.

60.

After approximately three weeks or a month, the kitchen workers stopped having their temperatures checked. Ex. 5, Holmes Dec. ¶ 18.

61.

Moreover, the bathrooms for kitchen workers are not stocked with soap, nor have they been for a year. Ex. 5, Holmes Dec. ¶ 11.

62.

Mr. Holmes works in the kitchen with around fifteen other workers. All but two men are from other units. Ex. 5, Holmes Dec. ¶ 17.

63.

Without such screening, the Defendant is knowingly leaving Nellson and all similarly situated prisoners in USP Florence exposed to the spread of a deadly virus that has created a pandemic across the globe.

64.

Further, upon information and belief, certain BOP facilities have no hand sanitizer and no soap for hand washing. https://www.motherjones.com/politics/2020/03/the-coronavirus-is-spreading-and-reportedly-theres-no-soap-at-this-federal-jail-in-brooklyn/ (last accessed March 15, 2020).

65.

Though the BOP claims it is providing hand soap free of charge to prisoners who cannot afford it, prisoners have not received any hand soap from the BOP free of charge. Ex. 2, Candelaria Dec. at ¶ 14; Ex. 3, Lymon Dec. ¶ 7-10; Ex. 4, Adams Dec. ¶¶ 5-7; Ex. 5, Holmes Dec. ¶¶ 10-12. Defendants' representations have been starkly contradicted by the individuals living the conditions every day.

66.

Rather, if a prisoner is indigent and has no funds with which to purchase hand soap, he must wait until he receives more money or hope that another prisoner will share his soap. Ex. 3, Lymon Dec. at ¶ 18; Ex. 4, Adams Dec. ¶ 6.

67.

Many of the people in USP Florence do not have any soap available. Ex. 3, Lymon Dec. at ¶ 4; Ex. 4, Adams Dec. ¶ 7; Ex. 5, Holmes. ¶ 12.

68.

Mr. Nellson and other prisoners in his unit have developed a dry cough, fatigue, chills, and muscle aches. Ex. 1, Nellson Dec. at ¶ 19 ("Everyone I know has been having a dry cough and chills. I have cold sweats and fatigue too."); Ex. 2, Candelaria Dec. ¶ 26 ("A couple weeks ago, I came down with fatigue, chills, and a cough, and I've been super tired. I've been getting a lot of muscle cramps and fatigue. I'm really tired, it feels like I'm running out of power."); Ex. 6, Upshaw Dec. ¶ 14 ("I've had a runny nose, stomach pain, and headaches for a month or two now. I also have a cough sometimes. I have a lot of health problems. I've never been seen for these symptoms."). These symptoms have persisted for weeks with no t

69.

In communications with prisoners, USP Florence recognizes these are the precise symptoms for COVID 19, "Perform an exit screening for COVID-19 symptoms (fever, cough, shortness of breath and temperature)."

https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last accessed July 2, 2020).

70.

Mr. Nellson was recently taken out of the facility for a medical appointment. He was not tested at the medical appointment, despite reporting his chills and muscle aches. Ex. 1, Nellson Dec. at ¶ 19.

71.

Mr. Nellson was then returned to USP Florence; upon reentry, he was asked if he had any symptoms, including chills and muscle aches. Again, he reported his chills and muscle aches. Ex. 1, Nellson Dec. at ¶ 20.

72.

The officer asking for symptoms then waved a laser thermometer at Mr. Nellson through a metal grate in the car. Mr. Nellson does not believe the thermometer read his temperature accurately because the wave was haphazard at best. Ex. 1, Nellson Dec. at ¶¶ 20-21.

73.

The officer then allowed Mr. Nellson to reenter the facility and his unit without any further testing, despite his reports of chills and muscle aches. Ex. 1, Nellson Dec. at ¶ 20.

74.

Mr. Nellson was never reevaluated or tested for COVID-19, despite reporting symptoms of it.

75.

Terry Upshaw had a similar experience. After being taken to the hospital in Colorado Springs, the officers' temperatures were tested upon reentering USP Florence. They did not, however, take Mr. Upshaw's temperature. Ex. 6, Upshaw Dec. ¶¶ 12-13.

76.

The BOP gave both its staff and prisoners masks to wear in the facility. Ex. 1, Nellson Dec. at ¶ 9.

77.

The first masks were flimsy and deteriorated quickly. Ex. 1, Nellson Dec. at ¶ 9.

78.

The BOP then gave out cloth masks and has exchanged them only once in the last month. Ex. 3, Lymon Dec. ¶ 4.

79.

Prisoners are not allowed out of their cells without masks on. Ex. 1, Nellson Dec. at ¶ 10.

80.

If a prisoner loses his mask, he does not get a replacement. Instead, he is told the BOP does not have anymore because they ran out. Ex. 2, Candelaria Dec. ¶ 5; Ex. 3, Lymon Dec. at ¶ 5.

81.

If a prisoner loses his mask but still needs to leave his cell to take a shower, use the law library, or talk on the phone, **he must then borrow someone else's mask**. Ex. 3, Lymon Dec. at ¶ 5; Ex. 4, Adams Dec. ¶ 4; Ex. 5, Holmes Dec. ¶ 7. Mask sharing is the epitome of fomites and endangers all prisoners by actively aiding the spread of the disease.

82.

Though wearing masks is required, staff and prisoners alike are inconsistent with wearing their masks. Ex. 1, Nellson Dec. at ¶ 12; Ex. 5, Holmes Dec. ¶ 6.

83.

BOP staff is not screening prisoners consistently to check for symptoms either; rather, they did so for a short time in March, and quickly stopped soon after. Ex. 4, Adams Dec. ¶ 15; Ex. 5, Holmes Dec. ¶ 22; Ex. 6, Upshaw Dec. ¶ 16.

84.

Very few prisoners in USP Florence have been tested for COVID. Ex. 4, Adams Dec. ¶ 13; Ex. 5, Holmes Dec. ¶ 20; Ex. 6, Upshaw Dec. ¶ 16. In fact, the BOP reports it has conducted 22 tests on a population of 718 prisoners.[1]

---

[1] https://www.bop.gov/coronavirus/ (showing 11 prisoners have had completed testing, and 11 more have pending tests, in a facility with 718 prisoners).

85.

The law library has recently been reopened, and prisoners are allowed to go at the same time as prisoners from other units. Ex. 1, Nellson Dec. at ¶ 17.

86.

When prisoners use the computers in the law library or use the phones, they are often shoulder to shoulder and cannot be socially distant. Ex. 2, Candelaria Dec. at ¶ 21; Ex. 4, Adams Dec. ¶ 9; Ex. 6, Upshaw Dec. ¶ 9.

87.

The computers and the phones are not sanitized after every person uses them. If a prisoner wants it clean before using it, he must somehow bring his own sanitizer to use. Ex. 4, Adams Dec. ¶¶ 10-11; Ex. 5, Holmes Dec. ¶¶ 14-15.

88.

Prisoners from other units go to psychology at the same time. Ex. 1, Nellson Dec. at ¶ 17.

89.

Prisoners from different units are placed in the Special Housing Unit ("SHU") together, where they can talk to each other all the time. Ex. 1, Nellson Dec. at ¶¶ 18.

90.

Prisoners are moved in and out of the SHU and back to their units constantly. Ex. 1, Nellson Dec. at ¶ 18.

91.

USP Florence has also reopened its yard, meaning prisoners from different units go to the same yard at the same time and intermingle with each other. Ex. 6, Upshaw Dec. ¶ 8.

92.

Louis Holmes works in the kitchen at USP Florence on the afternoon, or "PM," shift. Ex. 5, Holmes Dec. ¶ 16.

93.

Though the prisoners working in the kitchen were having their temperatures checked at the beginning of the COVID-19 pandemic, that practice was short-lived. Ex. 5, Holmes Dec. ¶ 18.

94.

After approximately three weeks or a month, the kitchen workers stopped having their temperatures checked. Ex. 5, Holmes Dec. ¶ 18.

95.

Moreover, the bathrooms for kitchen workers are not stocked with soap, nor have they been for a year. Ex. 5, Holmes Dec. ¶ 11.

96.

Mr. Holmes works in the kitchen with around fifteen other workers. All but two men are from other units. Ex. 5, Holmes Dec. ¶ 17.

97.

If any one individual contracts COVID-19, allowing him to be in contact with people from other units will cause the virus to spread, especially if the prisoners are not being tested.

98.

This risk is even greater when, considering Mr. Nellson's experience, the BOP is not taking symptoms seriously, and allowing symptomatic people to return to their units before being further screened and tested.

**H. BOP is stalling Mr. Nellson's grievance process.**

99.

After being assured there was an emergency grievance process, Mr. Nellson attempted to exhaust his administrative remedies.

100.

On April 17, 2020, Mr. Nellson submitted his informal resolution form. He received a response the same day, stating "At USP Florence, various measures have been implemented to safeguard inmates from COVID-19. These steps include, but not limited to, screening staff & inmates daily, providing soap for inmates to use, and having medical providers conducting rounds each day in your housing unit."

101.

Mr. Nellson then submitted his BP-9 on April 20, 2020. He then received a response from Warden Barnhart on April 21, 2020.

102.

Mr. Nellson then submitted his BP-10 to the Regional Director on April 23, 2020. He received a notice on May 6, 2020, from the North Central Regional Office informing him that "additional time is needed to respond to the regional appeal identified below. We are extending the time for response as provided for in the administrative remedy program statement." Ex. 7.

103.

Mr. Nellson did not receive a response to his BP-10 by the extension deadline. BOP simply ignored his grievance.

104.

When Mr. Nellson rightfully treated this silence as a denial, he attempted to file a BP-11.

105.

BOP then told Mr. Nellson could not do so until he received a response to his BP-10.

106.

BOP is therefore interfering and delaying Mr. Nellson's grievance process while arguing to this Court he must complete it before he can move forward with this lifesaving lawsuit.

107.

Defendants are also keeping prisoners in the dark regarding the grievance process, "The only reason we get stuff in here is we have prisoners who have been in here long enough to know the policies and know how to write grievances. We can't access the grievance policy because we're told it's sensitive information. They just give us an inmate handbook that has a short process of how to grieve an issue. Most people don't make it past the BP-8 or BP-9 step because they don't know what to do." Ex. 5, Holmes Dec. at ¶ 25. *See also* Ex. 5, Holmes Dec. at ¶ 26 ("We've only been told about the emergency grievance process for sexual assault stuff under PREA.").

108.

Notably, BOP has not informed prisoners at USP Florence of the emergency grievance procedure available at the facility, "We've never been told there's an emergency process where the Warden has to respond to us in 3 days." *Id.* at ¶ 27.

**I.   Class Action Allegations**

109.

Plaintiff brings this suit as a class action on behalf of himself and all others similarly situated (the "Class") pursuant to Rules 23(a), 23(b)(1), and 23(b)(2).

110.

Plaintiff seeks to represent the following Class on claims for declaratory and injunctive relief: **All current and future prisoners in the custody of the BOP at USP Florence during the course of the COVID-19 pandemic.**

111.

Plaintiff reserves the right to amend the class definition if further investigation and discovery demonstrates that the class definition should be narrowed, expanded, or otherwise modified. Excluded from the Class are all non-human persons/entities, Defendants, and Defendants' attorneys. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

112.

As a result of Defendants' pattern, practice, and policy of failing to screen prisoners in the custody of BOP, test prisoners who exhibit symptoms of COVID-19, and then isolate prisoners who test positive for COVID-19, the BOP is doing nothing to actually identify and prevent the spread of the COVID-19 virus. As a result, members of the Class are or will be deprived of their constitutional rights to be free of cruel and unusual punishment under the Eighth Amendment. Therefore, Plaintiff and putative Class members seek declaratory and injunctive relief to remedy Defendant BOP's illegal and unconstitutional actions, policies, and practices.

113.

As a result of Defendants' pattern, practice, and policy of failing to screen staff for symptoms, test staff members who exhibit COVID-19 symptoms, and exclude staff members in contact with prisoners in the custody of the BOP who test positive for COVID-19, Defendants doing nothing to actually identify and prevent the spread of the COVID-19 virus. As a result, members of the Class are or will be deprived of their constitutional rights to be free of cruel and unusual punishment under the Eighth Amendment. Therefore, Plaintiff and putative Class members seek declaratory and injunctive relief to remedy Defendants' illegal and unconstitutional actions, policies, and practices.

114.

The requirements of **Rule 23(a), 23(b)(1)**, and **23(b)(2)** are satisfied by this class action.

1. **Rule 23(a)**

   i. **Numerosity**

115.

The information as to the exact and present size of the Class and the identity of the persons in the Class is in the control of the BOP. On information and belief, the Class presently encompasses approximately 718. This number is based on the BOP's count of prisoners, available as of July 2, 2020. The number of persons who are members of the

Class described above are so numerous that joinder of all members in one action is impracticable.

### ii.    Commonality

116.

Questions of law and fact common to the entire Class predominate over individual questions because the actions of Defendant BOP complained of herein—with respect to Cruel and Unusual Punishment—were generally applicable to the entire class. The common answers that Plaintiffs seek are simple and will result in a common resolution for the class. These legal and factual questions include, but are not limited to:

a.  Whether the BOP, at USP Florence, has implemented and condoned a medical response to the COVID-19 pandemic that demonstrates deliberate indifference to the medical needs of the class members in failing to provide for the isolation of prisoners that show symptoms of the COVID-19 virus;

b.  Whether the BOP, at USP Florence, has implemented and condoned a medical response to the COVID-19 pandemic that inflicts cruel and unusual punishment as proscribed by the Eighth Amendment to the Constitution in failing to isolate prisoners that demonstrate symptoms of COVID-19 virus;

c.  Whether the BOP, at USP Florence, has implemented and condoned a medical response to the COVID-19 pandemic that demonstrates deliberate indifference to the medical needs of the class members in failing to provide for the systematic

testing of prisoners that show symptoms of the COVID-19 virus for that virus; and,

d. Whether the BOP, at USP Florence, has implemented and condoned a medical response to the COVID-19 pandemic that demonstrates inflicts cruel and unusual punishment as proscribed by the Eighth Amendment to the Constitution in failing to systematically test prisoners that demonstrate symptoms of COVID-19 virus for that virus.

### iii.   Typicality

117.

Plaintiff's claims are typical of the members of the Class because Plaintiff and all Class members were injured by the same policy and medical response to the COVID-19 pandemic as described in this Complaint: each exposed to suffering or death by the pandemic spread of COVID-19 from untested, un-isolated, prisoners showing symptoms of COVID-19. Plaintiff's claim against the Defendants with regard to Eighth Amendment arises from the same practices and course of conduct that gives rise to the Eighth Amendment claim against Defendants of the Class members and is based on the same legal theories.

### iv.   Adequacy

118.

Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are contrary to or in conflict with those of the Class he seeks to represent.

119.

Plaintiff has retained competent counsel in both civil rights and class action litigation and will provide affidavits in support of this in his motion for class certification.

**2. Rule 23(b)(1)**

120.

In this case, prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and would establish incompatible standards of conduct for the party opposing the class. Here, if any other potential class member filed a lawsuit in this Court or in State Court seeking to declare the Defendants medical response plan to the COVID-19 virus this could create the risk of inconsistent or varying adjudications between or within these courts. In addition, if any other potential class member filed a lawsuit in this Court or in State Court seeking to enjoin Defendants COVID-19 response plan, the Defendant could be in the bizarre and untenable position of being unable to comply with one court order without simultaneously violating another court order. Therefore, certification of the Class under Rule 23(b)(1) is proper.

**3. Rule 23(b)(2)**

121.

Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper. Based on the practice and policy of failing to:

- screen prisoners and staff members of USP Florence, for symptoms of COVID-19, including fever, every day or at least every other day;

- test all prisoners and staff members of USP Florence, for COVID-19, understanding that each day more people test positive who are asymptomatic;

- test prisoners and staff members of USP Florence, who exhibit symptoms of COVID-19;

- isolate prisoners of USP Florence, testing positive for COVID-19; and

- exclude staff members of USP Florence, testing positive for COVID-19 from contact with BOP prisoners;

- identify prisoners eligible for home confinement; and

- identify prisoners eligible for transfer to less crowded BOP facilities.

Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with regard to Class members as a whole and certification of the Class under Rule 23(b)(2) proper.

## COUNT I
## DECLARATORY AND INJUNCTIVE RELIEF FOR DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO ADEQUATE MEDICAL CARE PURSUANT TO 28 U.S.C. §§ 1343, 2201 and 2202
*(Federal claim against Defendants Federal Bureau of Prisons and Warden J. Barnhart)*

122.

Plaintiff incorporates paragraphs 1 through 121 and all paragraphs this Court deems relevant to support this Count.

123.

Based on the incorporated paragraphs to support Count I, Defendants' acts and omissions in failing to provide adequate medical care—specifically the screening, testing, and isolation of prisoners testing positive for COVID-19 virus, as well as the failure to exclude staff members testing positive for COVID-19 from contact with BOP prisoners, including prisoners oat USP Florence—**constitute deliberate indifference to the serious medical needs of Nellson, and all members of the Class, thereby establishing a violation of the Eighth Amendment of the United States Constitution**. There simply is no doubt that based on the facts incorporated to support this Count, that these defendants know of and appreciate the serious risk of  harm to the prison population, and simply have not taken reasonable steps to abate that harm.

124.

Defendants violated, and continues to violate, Nellson's and the entire class's Eighth Amendment rights by the deliberate enactment and enforcement of a policy not consistent with medical standards, which in effect, denied Nellson, and the entire class, from screening for COVID-19 and testing of both staff and prisoners demonstrating symptoms of the COVID-19 virus. Prisoners testing positive for COVID-19 should be isolated. BOP staff, including staff members of USP Florence, testing positive for COVID-19 should be excluded from contact with BOP prisoners, including prisoners at USP Florence. To a reasonable degree of medical certainty, the Defendants' acts and omissions, including its enforcement of the BOP's and USP Florence COVID-19 guidelines, if any, fell so substantially outside the standard of care and opposite reasonable medical judgment that they constituted a deliberate act of refusing Nellson and the entire class access to any medical care to prevent the spread of COVID-19—a deadly disease that can rapidly spread and advance to a deadly stage.

125.

To the extent that tests for the COVID-19 virus was not provided because of financial considerations, such concerns are in violation of the U.S. Constitution, as they deny necessary and adequate medical care to Nellson and other similarly situated prisoners in violation of the Eighth Amendment to the United States Constitution.

126.

To the extent that prisoners showing symptoms of the COVID-19 virus and/or testing positive for COVID-19 were not isolated because of financial considerations, such concerns are in violation of the U.S. Constitution, as they deny necessary and adequate medical care to Nellson and other similarly situated BOP prisoners in violation of the Eighth Amendment to the United States Constitution.

127.

To the extent that Defendants' staff showing symptoms of the COVID-19 virus and/or testing positive for COVID-19 were not kept from BOP prisoners because of financial considerations, **such concerns are in violation of the U.S. Constitution, as they deny necessary and adequate medical care to Nellson** and other similarly situated BOP prisoners in violation of the Eighth Amendment to the United States Constitution.

128.

Consequently, Plaintiff is entitled to declaratory relief declaring the Defendants' actions in failing to screen, test BOP prisoners, including prisoners at USP Florence, showing symptoms of COVID-19, and isolate BOP prisoners, including prisoners at USP Florence, who tested positive for COVID-19 virus is an unconstitutional deprivation of Plaintiff's rights to be free of cruel and unusual punishment and injunctive relief enjoining the Defendants from continuing its failure to isolate and test prisoners showing such symptoms.

129.

Similarly, Plaintiff is entitled to declaratory relief declaring the Defendants' actions in failing to screen, test BOP staff, including staff at USP Florence, showing symptoms of COVID-19, and exclude BOP staff who tested positive for the COVID-19 virus from contact with BOP prisoners, is an unconstitutional deprivation of Plaintiff's rights to be free of cruel and unusual punishment and injunctive relief enjoining Defendants from continuing its failure to isolate and test prisoners showing such symptoms.

## ATTORNEY FEES

**Based on the foregoing,** Plaintiff is entitled to reasonable attorney's fees under all applicable laws, including the Equal Access to Justice Act, 28 U.S.C. § 2412.

## PRAYER FOR RELIEF

**WHEREFORE**, Edward Nellson prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That Plaintiff recover all costs of this litigation;

(c) That a jury trial be had on all issues so triable;

(d) That this Court certify a Class for the purposes of the permanent injunctive relief sought based on the proposed Class definition in this Complaint, subject to any modifications this Court deems proper for the adjudication of the rights alleged to be violated;

(e) That this Court issue an injunction and declaratory relief, requiring the BOP to immediately abandon its policy of inaction and begin consistently screening prisoners and staff in USP Florence for symptoms of COVID-19, **by at the very minimum testing prisoners and staff for fever daily**; and

(f) That this Court issue an injunction and declaratory relief, requiring the BOP to immediately abandon its policy of inaction and begin testing all prisoners in USP-Florence for COVID-19; and

(g) That this Court issue an injunction and declaratory relief, requiring testing of prisoners and staff in USP-Florence demonstrating symptoms of the COVID-19 virus, *to wit*, fevers, cough, and shortness of breath; and

(h) That this Court issue an injunction and declaratory relief, requiring isolation of BOP prisoners in USP Florence as soon as they exhibit symptoms of COVID 19, that they be tested for COVID 19, and that they only be returned once cleared or recovered;

(i) That this Court issue an injunction and declaratory relief declaring that all BOP staff in USP Florence testing positive for COVID-19 be excluded from contact with BOP prisoners;

(j) That this Court issue an injunction ordering the BOP to exercise its power and authority to immediately begin identifying prisoners at USP Florence who are

eligible for compassionate release and begin the compassionate release review process for such prisoners

(k) That this Court issue an injunction ordering the BOP to exercise its power and authority to immediately begin identifying prisoners who are eligible for transfer to another BOP facility where social distancing is possible; and

(l) That this Court order BOP to require gloves for any individual serving foods at USP Florence; and

(m)    That this Court award attorney's fees under all applicable laws, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(n) That Plaintiff receive such other and further relief as the Court deems just and proper.

Respectfully submitted this 16th day of July 2020,

/s/ MARIA-VITTORIA G. CARMINATI
Maria-Vittoria G. Carminati (Co #50579)

**NDH LLC**
4601 DTC Blvd., Suite 300
Denver, CO 80237
720-445-5655
mvcarminati@ndh-law.com

/s/ MARIO WILLIAMS
Mario B. Williams (Ga # 235254)

**NDH LLC**
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303

404-254-0442 / 404-935-9391 FAX
mwilliams@ndh-law.com

                                        /s/ ALEXANDRA PARROTT
                                        Alexandra L. Parrott (CO # 54188)

**NDH LLC**
4601 DTC Blvd., Suite 300
Denver, CO 80237
720-445-5655
aparrott@ndh-law.com